UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

FRANK NELSON,

                Plaintiff,

v.

DEPUY SYNTHES SALES, INC., d/b/a
DEPUY SYNTHES JOINT
RECONSTRUCTION; DEPUY
SYNTHES, INC.; DEPUY ORTHOPAEDICS,
INC., JOHNSON & JOHNSON; STRYKER
CORPORATION; HOWMEDICA
OSTEONICS CORPORATION, d/b/a
STRYKER ORTHOPAEDICS;
and AAP IMPLANTS
INC.,

                Defendants

Civil Action No:  3:18-cv-675-CRS

COMPLAINT FOR DAMAGES

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, Frank Nelson, by counsel, and for his Complaint against Defendants, DePuy Synthes Sales, Inc., d/b/a DePuy Synthes Joint Reconstruction, DePuy Synthes, Inc., DePuy Orthopaedics, Inc., Johnson & Johnson, Stryker Corporation, Howmedica Osteonics Corporation, d/b/a Stryker Orthopaedics, and aap Implants, Inc. (collectively, the "Defendants"), alleges as follows:

## NATURE OF THE CASE

1.      This is an action for damages suffered by Frank Nelson, as a direct and proximate result of the wrongful conduct of Defendants, DePuy Synthes Sales, Inc., d/b/a DePuy Synthes Joint Reconstruction, DePuy Synthes, Inc., DePuy Orthopaedics, Inc., and Johnson & Johnson

(collectively, the "DePuy Defendants"), in connection with the development, design, manufacture, distribution, and selling of the knee replacement product, the ATTUNE Primary Total Knee System (hereinafter, the "DePuy Attune Knee") and the wrongful conduct of Defendants, Stryker Corporation, Howmedica Osteonics Corporation, d/b/a Stryker Orthopaedics, and aap Implants, Inc. (collectively, the "Simplex HV Defendants"), in connection with the development, design, manufacture, distribution, and selling of its bone cement product, Stryker Simplex HV Bone Cement (hereinafter, "Simplex HV Bone Cement").

2.      DePuy Defendants knew or should have known that the DePuy Attune Knee can loosen in patients, such as Plaintiff Frank Nelson, causing personal injury, significant pain, and loss of movement, and that this injury can only be remedied through subsequent revision surgery. Further, DePuy Defendants misled health care professionals and the public into believing that the DePuy Attune Knee was safe and effective for use in knee replacement surgery; engaged in deceptive, misleading and unconscionable promotional or sales methods to convince health care professionals to utilize the DePuy Attune Knee, even though DePuy Defendants knew or should have known that the DePuy Attune Knee was unreasonably unsafe; and failed to warn health care professionals and the public about the safety risks of the DePuy Attune Knee.

3.      Simplex HV Defendants knew or should have known that its Simplex HV Bone Cement can have problems with bonding bone with knee implants in patients, such as Plaintiff Frank Nelson, causing personal injury, significant pain, and loss of movement, and that this injury can only be remedied through subsequent revision surgery. Further, Simplex HV Defendants misled health care professionals and the public into believing that the Simplex HV Bone Cement was safe and effective for use in knee replacement surgery; engaged in deceptive, misleading, and unconscionable promotional or sales methods to convince health care

professionals to utilize the Simplex HV Bone Cement, even though Simplex HV Defendants knew or should have known that the Simplex HV Bone Cement was unreasonably unsafe; and failed to warn health care professionals and the public about the safety risks of the Simplex HV Bone Cement.

## PARTIES

4.    Plaintiff, Frank Nelson, is and, at all relevant times, was a citizen and resident of Louisville, Jefferson County, Kentucky.

5.    Defendant, DePuy Synthes Sales, Inc., d/b/a DePuy Synthes Joint Reconstruction, is a corporation organized and existing under the laws of Massachusetts, has its principal place of business located at 325 Paramount Drive, Raynham, Massachusetts 02767-0350, and is registered and authorized to do business in the Commonwealth of Kentucky.

6.    Defendant, DePuy Synthes, Inc., is a corporation organized and existing under the laws of Delaware and has its principal place of business located at 700 Orthopaedic Drive, Warsaw, Indiana 46582.

7.    Defendant, DePuy Orthopaedics, Inc., is a corporation organized and existing under the laws of the state of Indiana and has its principal place of business located at 700 Orthopaedic Drive, Warsaw, Indiana 46581.

8.    Defendant, Johnson & Johnson, is and was a public entity or corporation organized and existing under the laws of the State of New Jersey and has its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

9.    At all relevant times, each of the Depuy Defendants listed above was the representative, agent, employee, or alter ego of the other Defendant, and in doing the things alleged herein was acting within the scope of its authority as such.

10.     At all times material hereto, DePuy Defendants developed, designed, tested, manufactured, distributed, marketed, and sold the DePuy Attune Knee. DePuy Defendants' products, including the DePuy Attune Knee, are sold throughout the world including the Commonwealth of Kentucky.

11.     Defendant, Stryker Corporation, is a public corporation organized and existing under the laws of Michigan and has its principal place of business located at 2825 Airview Boulevard, Kalamazoo, Michigan 49002.

12.     Defendant, Howmedica Osteonics Corporation, d/b/a Stryker Orthopaedics, is a public corporation organized and existing under the laws of New Jersey, has its principal place of business located at 325 Corporate Boulevard, Mahwah, New Jersey 07430, and is registered and authorized to do business in the Commonwealth of Kentucky. Upon information and belief, at all times relevant, Defendant, Howmedica Osteonics, is a wholly owned subsidiary of Defendant, Stryker Corporation, and does business as Stryker Orthopaedics.

13.     Defendant, aap Implants Inc. is a corporation organized and existing under the laws of the state of Delaware, has its principal place of business located at 747 Third Ave., 4th Floor, New York, New York 10017, and is registered and authorized to do business in the Commonwealth of Kentucky.

14.     At all relevant times, each of the Simplex HV Defendants listed above was the representative, agent, employee, or alter ego of the other Defendant, and in doing the things alleged herein was acting within the scope of its authority as such.

15.     At all times material hereto, Simplex HV Defendants developed, designed, tested, manufactured, distributed, marketed, and sold the Simplex HV Bone Cement. Simplex HV

Defendants' products, including the Simplex HV Bone Cement, are sold throughout the world including the Commonwealth of Kentucky.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

17.     Venue in this action properly lies in this judicial district pursuant to 28 U.S.C. § 139l(a), as a substantial number of the events, actions or omissions giving rise to Plaintiff's claims occurred in this district. At all times material hereto, Defendants conducted substantial business in this district.

## FACTUAL BACKGROUND

## KNEE REPLACEMENT BACKGROUND

18.     The knee is the largest joint in the human body, consisting of three individual bones: the shin bone (tibia), the thigh bone (femur), and the knee-cap (patella). The knee joint is lined with cartilage to protect the bones from rubbing against each other. This ensures that the joint surfaces can glide easily over one another. The human knee is a complicated joint which supports the entire body weight on four small surfaces through a variety of motions essential to everyday life. It is also the joint most susceptible to arthritis.

19.     With the increases in lifespan, people have begun to suffer pain and disability from knee joint arthritis at significant rates. Knee replacement technology can provide a solution to the pain and restore basic function to those implanted. The knee replacement implants designed and approved in the 1990s met the goals of reducing pain and restoring function with low failure rates.

5

20.     Total knee arthroplasty ("TKA"), also called total knee replacement ("TKR"), is a common medical procedure performed. The surgery is designed to help relieve pain, improve joint function, and to replace bones, cartilage, and/or tissue that have been severely injured and/or worn down generally in people with severe knee degeneration due to arthritis, other disease, or trauma. A TKA is ordinarily a successful orthopedic procedure with excellent clinical outcomes and survivorship.

21.     In a TKA surgery, physicians replace the joint surfaces and damaged bone and cartilage with artificial materials. The replacement redistributes weight and removes the tissue and/or bone causing inflammation and thus reduces pain while improving the joint's function. Replacement requires a mechanical connection between bones and the implant components.

22.     Upon information and belief, about 85 to 90 percent of total knee replacements are successful up to ten years.

23.     Bone cement, or epoxy, is used to attach components of the new artificial knee joint to the femur (thigh bone) and tibia (shin bone). Bone cement includes a powder and a liquid that must be combined. The powder component consists mainly of polymer poly (methyl methacrylate) ("PMMA") and includes a radiopacifier to make the cement visible on x-rays. The liquid component is a methyl methocrylate ("MMA") monomer which is added to the powder to create a heat-generating (exothermic) reaction.

24.     Mechanical loosening means that for some reason (other than infection) the attachment between the artificial knee and the bone has become loose.

25.     A loose artificial knee is a problem because it causes pain and wearing away of the bone. A painful loose knee can restrict the patient's daily activities severely. A loose artificial knee also involves severe psychical burden for the patient.

26.     Once the pain becomes unbearable or the individual loses function of the knee, another operation will probably be required to revise the knee replacement. A loose, painful artificial knee can usually, but not always, be replaced.

27.     The purpose of knee revision surgery is to remove a failed knee implant and replace it with a new one.

28.     Upon information and belief, in a revision operation of a total knee failed by loosening the biggest problem is usually to reconstruct the severe bone loss caused by bone destruction around the failed total knee prosthesis, and restore the stability in the revised total knee.

29.     Upon information and belief, the results of a revision operation are not as good as the first, and the risks of complications are higher. The range of motion in the knee after the revision surgery may be smaller and the walking capacity may be also diminished. The rate of loosening is higher after revision surgery than in primary knee replacement surgery.

## DEPUY ATTUNE KNEE FACTS

30.     DePuy Orthopaedics was founded in 1895 and was the first commercial orthopaedics company in the U.S. It purports to be a global leader in orthopaedic devices, including knee products. Today, DePuy Synthes Joint Reconstruction has over 200 products.

31.     DePuy Defendants manufactured, labeled, packaged, distributed, supplied, marketed, advertised, and/or otherwise engaged in all activities that are part and parcel of the sale and distribution of a pharmaceutical, and by said activities, caused the DePuy Attune Knee to be placed into the stream of commerce throughout the United States.

32.     DePuy Defendants made, participated in, and/or contributed to filings with the FDA in conjunction with the approval process for the DePuy Attune Knee.

33.     Upon information and belief, DePuy Defendants were in control of the design, assembly, manufacture, marketing, distribution, packaging, labeling, processing, supplying, promotion, sales, and the issuance of product warnings and related information with respect to the DePuy Attune Knee.

34.     DePuy Defendants were at all times material hereto subject to the laws of the United States of America, including provisions relating to the FDA, and the rules and regulations thereof, in conjunction with the approval process, labeling, and other after- market activities that pertain to the DePuy Attune Knee.

35.     The DePuy Attune Knee has been widely advertised, marketed and represented by the DePuy Defendants as a safe and effective treatment.

## DEPUY ATTUNE KNEE PROBLEMS

36.     As of June 2017, the FDA had about 1,400 reports involving failure with the DePuy Attune Knee, including at least 633 cases where patients required revision surgery.

37.     During revision surgeries, surgeons found severe tibial loosening.

38.     DePuy Defendants became aware of the safety issues with the DePuy Attune Knee as early as 2013 from disclosures in failure reports submitted to and kept in the FDA's Manufacturer and User Facility Device Experience ("MAUDE"), database. Even after being aware of the DePuy Attune Knee's safety issues, the product labeling and product information for the DePuy Attune Knee failed to contain adequate information, instructions, and warnings concerning implantation of the product and the risks that the DePuy Attune Knee can loosen in patients.

39.     Despite its knowledge of the serious injuries associated with use of the DePuy Attune Knee, DePuy Defendants engaged in a marketing and advertising program which as a

whole, by affirmative and material misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of the DePuy Attune Knee was safe.

40. Upon information and belief, DePuy Defendants downplayed and understated the health hazards and risks associated with the use of the DePuy Attune Knee and through promotional literature as well as sales visits to orthopaedic surgeons, deceived doctors and potential users of the DePuy Attune Knee by relaying positive information, while concealing the nature and extent of known adverse and serious health effects.

41. Furthermore, because of the safety issues with the DePuy Attune Knee, DePuy Defendants went to the FDA in March 2016 with a 510(k) premarket notice of intent to market the ATTUNE Revision Knee System (Attune S+), which included anew stem, with added length and a keel for additional stability and recessed cement pockets intended to promote cement fixation. DePuy Defendants launched the Attune S+ in 2017 but did not recall the original DePuy Attune Knee with its original defective ATTUNE Tibial Tray (baseplate). DePuy Defendants also did not inform consumers or surgeons about the dangers of using the DePuy Attune Knee.

## SIMPLEX HV BONE CEMENT FACTS

42. Cement "viscosity" determines the handling and working properties of the cement. Bone cement may be divided into three kinds: low, medium, and high viscosity ("HV").

43. Simplex HV Defendants manufacture, market, and sell the "Simplex family of bone cements," including Simplex P and Simplex HV bone cements.

44. Upon information and belief, Simplex P is a low or medium viscosity bone cement, also known as "non-HV." According to Simplex HV Defendants, as of 2008, Simplex P "emerged as the most used bone cement in the US" and "[n]o other bone cement has stronger survivorship than Simplex P."

45.     Upon information and belief, prior to the release of Simplex HV Bone Cement, Simplex HV Defendants promoted their non-HV Simplex P bone cements as being stronger, safer, and more effective than HV bone cements manufactured and sold by other companies at that time.

46.     In a 2008 brochure, Simplex HV Defendants explained the importance of viscosity by stating, "[t]he deeper cement penetrates into bone, the stronger the fixation and shear strength of the bond. HV cements cannot be pressurized into bone as well as medium viscosity cements."

47.     Further, Simplex HV Defendants explained the concept of "creep" by stating, "[t]he physical behavior of bone cement has clinical significance in terms of mechanical fixation and loosening.  Bone cements that creep too much may lead to *component shifting, loosening, and failure*."  This section of the brochure was titled, "Creep Matters: Simplex [P] Creeps Less Than High Viscosity Cements."

48.     Despite Simplex HV Defendants promoting that its non-HV cements were stronger, safer, and more effective than HV bone cements, Simplex HV Defendants devised a plan to design, manufacture, market, and sell their own HV bone cements.

49.     Simplex HV bone cement, the product at issue, is a high viscosity cement. Simplex HV liquid when packed with Simplex HV cement powder forms the product Simplex HV Bone Cement.  Mixing the two separate components produces a ductile bone cement which, after hardening, fixes the implant and transfers stresses produced during movement to the bone.

50.     Upon information and belief, Simplex HV Bone Cement received FDA clearance under the "510k" notification process. The basis for FDA clearance for many bone cements is that the bone cement was substantially similar to prior bone cements.

51. Simplex HV Defendants used the 510k approval process and claim that these HV bone cements are "substantially equivalent" to the non-HV cements that have been in use for decades. However, in fact—and as previously represented by Stryker—the HV cement was and is less effective, and more prone to component shifting, loosening, and failure than previously-approved bone cements.

52. According to the Orthopaedic Research Society, researchers found HV cement less effective than low- or medium-viscosity bone cement ("non-HV").

### SIMPLEX HV BONE CEMENT PROBLEMS

53. According to the *Journal of Arthroplasty*, recent medical literature has shown that HV bone cements, like Simplex HV Bone Cements, are causing tibial component debonding, even when utilized with historically well-performing knee implants.

54. The tibial component loosened and debonded at the implant-cement interface in patients who received HV bone cement, including Stryker's Simplex HV Bone Cement.

55. According to the Orthopaedic Research Society, researchers found HV cement less effective than low-viscosity or medium viscosity bone cements ("non-HV").

56. The primary reason the Simplex HV Bone Cement fails is mechanical loosening, caused by a failure of the bond between the tibial baseplate at the implant-cement interface. Such loosening will eventually result in failure of the device. Studies have shown that mechanical loosening has occurred at a significantly increased rate in patients implanted with HV bone cement, including Simplex HV Bone Cement.

57. Simplex HV Defendants knew or should have known about the early failure rates and safety issues with its HV Bone Cements, including Simplex HV Bone Cement.

58. Despite Simplex HV Defendants' knowledge of early failures, Stryker Corp. continues to represent that its HV bone cements, including Simplex HV Bone Cement, are safe

11

and effective. For instance, in 2014, Stryker promoted "Simplex HV" as "A New Level of Strength, Speed and Handling."

59.     Although Simplex HV Defendants previously represented that HV bone cements are not as strong and effective because they do not penetrate the bone as well as Simplex P, Simplex HV Defendants suggest its internal test results show Simplex HV bone cement has a "statistically equivalent depth of intrusion compared to Simplex P."   Further, Simplex HV Defendants states that "Simplex P and Simplex HV both achieve greater than the studies recommended 4mm depth of cement penetration into cancellous bone."

60.     Simplex HV Defendants actively and aggressively marketed, promoted, and represented to doctors that Simplex HV Bone Cement could provide the speed and rapid mixing times of high-viscosity cement, while also marketing, promoting, and representing that Simplex HV Bone Cement was as strong, safe, and effective as non-HV cements.

61.     Although Simplex HV Defendants knew about the high number of Simplex HV Bone Cement early failures resulting in revision surgeries, Simplex HV Defendants failed to warn surgeons, consumers, and patients, and allowed, marketed, and promoted the defective design to continue to be implanted by unsuspecting surgeons into unsuspecting patients, including Mr. Nelson and his physicians.

### FACTUAL ALLEGATIONS

62.     The treating physicians for Plaintiff and/or Norton Women's and Children's Hospital were exposed to the aforementioned advertising and marketing campaign directly by the DePuy Defendants and Simplex HV Defendants.

63.     Plaintiff's physicians and/or Norton Women's and Children's Hospital, either through direct promotional contact with the Defendants' Sales Representatives, through word-of-

mouth from other health care providers, and/or through promotional materials, received the information the Defendants intended that they receive, to-wit: that the DePuy Attune Knee and Stryker's Simplex HV Bone Cement were safe and effective for use in TKA procedures.

64. On November 16, 2015, Plaintiff's physician implanted a DePuy Attune Knee in Plaintiff Frank Nelson's right leg.

65. On November 16, 2015, in order to bond the DePuy Attune Knee with Plaintiff's bones, Plaintiff's physician used the defective Stryker's Simplex HV Bone Cement.

66. On February 19, 2018, Plaintiff Frank Nelson had a second surgery to revise/replace his previously implanted and loosened DePuy Attune Knee.

67. As a direct and proximate result of the use of the DePuy Attune Knee and Simplex HV Bone Cement, Plaintiff suffered, and continues to suffer serious bodily injury and harm.

68. As a direct and proximate result of the use of the DePuy Attune Knee and Simplex HV Bone Cement, Plaintiff incurred and continues to incur medical expenses to treat his injuries and condition.

69. At no time material to his use of the DePuy Attune Knee and Simplex HV Bone Cement was Plaintiff or his physicians told, warned, or given information about the higher risks of loosening in the DePuy Attune Knee or the risks of loosening from using Simplex HV Bone Cement.

## CAUSES OF ACTION

### COUNT I
### (Strict Liability)

70. Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

13

71.     At all relevant times hereto, DePuy Defendants were engaged in the development, testing, manufacturing, marketing and sales of the DePuy Attune Knee. DePuy Defendants designed, manufactured, marketed, and sold the DePuy Attune Knee to medical professionals and their patients, knowing it would be implanted for knee replacements.

72.     The DePuy Attune Knee as designed, manufactured, marketed and sold by DePuy Defendants reached Plaintiff without substantial change in its condition and was used by Plaintiff in a reasonably foreseeable and intended manner.

73.     The DePuy Attune Knee was "defective" and "unreasonably dangerous" when it entered the stream of commerce and was received by Plaintiff, because it was dangerous to an extent beyond that which would be contemplated by the ordinary consumer. At no time did Plaintiff have reason to believe that the DePuy Attune Knee was in a condition not suitable for their proper and intended use among patients.

74.     The DePuy Attune Knee was used in the manner for which it was intended, that is, for artificial knee replacement. This use resulted in injury to Plaintiff.

75.     Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of the DePuy Attune Knee. Further, in no way could Plaintiff have known that DePuy Defendants had designed, developed, and manufactured the DePuy Attune Knee in such a way as to increase the risk of harm or injury to the recipients of it.

76.     The DePuy Attune Knee is defective in design because of its propensity to loosen and cause patients unnecessary pain and repeated surgical procedures.

77.     The DePuy Attune Knee is unreasonably dangerous because it was sold to Plaintiff without adequate warnings regarding, *inter alia,* the propensity of DePuy Attune Knee

14

to loosen and cause serious pain and necessitate additional surgery; the post-marketing experience of higher rates of loosening and revision surgery with the DePuy Attune Knee; and the probability of suffering loosening and revision surgery.

78. DePuy Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were feasible and marketable at the time DePuy Defendants sold the DePuy Attune Knee to Plaintiff.

79. DePuy Defendants had knowledge and information confirming the defective and dangerous nature of the DePuy Attune Knee. Despite this knowledge and information, DePuy Defendants failed to adequately and sufficiently warn Plaintiff and his physicians that the DePuy Attune Knee causes serious injuries including, loosening, and revision surgery.

80. As a direct and proximate result of DePuy Defendants' wrongful conduct, including the DePuy Attune Knee's defective and dangerous design and inadequate warnings, Plaintiff has sustained and will continue to sustain severe and debilitating injuries, economic loss, and other damages including, but not limited to, cost of medical care, rehabilitation, lost income, permanent instability and loss of balance, immobility, and pain and suffering, for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

81. At all relevant times hereto, Simplex HV Defendants were engaged in the development, testing, manufacturing, marketing and sales of the Simplex HV Bone Cement. Simplex HV Defendants designed, manufactured, marketed, and sold the Simplex HV Bone Cement to medical professionals and their patients, knowing it would be used to bond implanted knee replacements to bone.

82.     Simplex HV Bone Cement as designed, manufactured, marketed and sold by Simplex HV Defendants reached Plaintiff without substantial change in its condition and was used by Plaintiff's physician and/or medical personnel in a reasonably foreseeable and intended manner.

83.     Simplex HV Bone Cement was "defective" and "unreasonably dangerous" when it entered the stream of commerce and was received by Plaintiff, because it was dangerous to an extent beyond that which would be contemplated by the ordinary consumer. At no time did Plaintiff have reason to believe that the Simplex HV Bone Cement was in a condition not suitable for their proper and intended use among patients.

84.     Simplex HV Bone Cement was used in the manner for which it was intended, that is, for binding an artificial knee replacement to bone. This use resulted in injury to Plaintiff.

85.     Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of Simplex HV Bone Cement. Further, in no way could Plaintiff have known that Simplex HV Defendants had designed, developed, and manufactured the Simplex HV Bone Cement in such a way as to increase the risk of harm or injury to the recipients of it.

86.     Simplex HV Bone Cement is defective in design because of its propensity to become "debonded" in knee replacement components, causing the knee implant to loosen and cause patients unnecessary pain and repeated surgical procedures.

87.     Simplex HV Bone Cement is unreasonably dangerous because it was sold to Plaintiff without adequate warnings regarding, *inter alia,* the propensity of Simplex HV Bone Cement to loosen and cause serious pain and necessitate additional surgery; the post-marketing

experience of higher rates of loosening and revision surgery with Simplex HV Bone Cement; and the probability of suffering loosening and revision surgery.

88.     Simplex HV Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were feasible and marketable at the time Simplex HV Defendants sold the Simplex HV Bone Cement to Plaintiff.

89.     Simplex HV Defendants had knowledge and information confirming the defective and dangerous nature of the Simplex HV Bone Cement. Despite this knowledge and information, Simplex HV Defendants failed to adequately and sufficiently warn Plaintiff and his physicians that the Simplex HV Bone Cement causes serious injuries including, loosening, and revision surgery.

90.     As a direct and proximate result of Simplex HV Defendants' wrongful conduct, including the Simplex HV Bone Cement's defective and dangerous design and inadequate warnings, Plaintiff has sustained and will continue to sustain severe and debilitating injuries, economic loss, and other damages including, but not limited to, cost of medical care, rehabilitation, lost income, permanent instability and loss of balance, immobility, and pain and suffering, for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

91.     Defendants acted maliciously and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

92.     WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, and all such other relief as the Court deems proper.

## COUNT II
## (Products Liability – Failure to Warn)

93.     Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

94.     DePuy Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the DePuy Attune Knee and, in the course of same, directly advertised or marketed the product to the FDA, health care professionals, and consumers, or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of the DePuy Attune Knee.

95.     DePuy Defendants failed to adequately warn health care professionals and the public, including Plaintiff Frank Nelson and his prescribing physician, of the true risks of the DePuy Attune Knee, including that the DePuy Attune Knee could loosen, causing severe pain and injury, and requiring further treatment, including revision surgery and/or knee replacement.

96.     DePuy Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the DePuy Attune Knee. Had they done so, proper warnings would have been heeded and no health care professional, including Plaintiff's physician, would have prescribed the DePuy Attune Knee, or no consumer, including Plaintiff, would have purchased and/or used the DePuy Attune Knee.

97.     DePuy Defendants failed to timely and reasonably provide adequate instructions and training concerning safe and effective use of the DePuy Attune Knee. Had they done so, healthcare professionals, including Plaintiff's physician, could have safely and effectively implanted the DePuy Attune Knee, without causing serious pain and injury to patients, including Plaintiff.

98.     The DePuy Attune Knee, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by DePuy Defendants, was defective due to inadequate post-marketing warnings and/or instruction because, after DePuy Defendants knew or should have known that there was reasonable evidence of an association between the DePuy Attune Knee and knee replacement loosening causing serious injury and pain. DePuy Defendants failed to provide adequate warnings to health care professionals and the consuming public, including Plaintiff, and continued to aggressively promote the DePuy Attune Knee.

99.     DePuy Defendants failed to perform or otherwise facilitate adequate testing; failed to reveal and/or concealed testing and research data; and selectively and misleadingly revealed and/or analyzed testing and research data.

100.    Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of the DePuy Attune Knee. Further, in no way could Plaintiff have known that DePuy Defendants had designed, developed, and manufactured the DePuy Attune Knee in such a way as to increase the risk of harm or injury to the recipients of it.

101.    As a direct and proximate result of the conduct of DePuy Defendants as aforesaid, Plaintiff suffered serious and permanent non-economic and economic injuries.

102.    Simplex HV Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the Simplex HV Bone Cement and, in the course of same, directly advertised or marketed the product to the FDA, health care professionals, and consumers, or persons

responsible for consumers, and therefore had a duty to warn of the risks associated with the use of the Simplex HV Bone Cement.

103. Simplex HV Defendants failed to adequately warn health care professionals and the public, including Plaintiff Frank Nelson and his prescribing physician, of the true risks of the Simplex HV Bone Cement, including that the Simplex HV Bone Cement could "debond" in knee replacement components, causing the implant to loosen, causing severe pain and injury, and requiring further treatment, including revision surgery and/or knee replacement.

104. Simplex HV Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of Simplex HV Bone Cement. Had they done so, proper warnings would have been heeded and no health care professional, including Plaintiff's physician, would have prescribed the Simplex HV Bone Cement, or no consumer, including Plaintiff, would have purchased and/or used Simplex HV Bone Cement.

105. Simplex HV Defendants failed to timely and reasonably provide adequate instructions and training concerning safe and effective use of the Simplex HV Bone Cement. Had they done so, healthcare professionals, including Plaintiff's physician, could have safely and effectively used the Simplex HV Bone Cement, without causing serious pain and injury to patients, including Plaintiff.

106. Simplex HV Bone Cement, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by Simplex HV Defendants, was defective due to inadequate post-marketing warnings and/or instruction because, after Simplex HV Defendants knew or should have known that there was reasonable evidence of an association between the Simplex HV Bone Cement and knee replacement loosening causing serious injury and pain. Simplex HV

Defendants failed to provide adequate warnings to health care professionals and the consuming public, including Plaintiff, and continued to aggressively promote the Simplex HV Bone Cement.

107.   Simplex HV Defendants failed to perform or otherwise facilitate adequate testing; failed to reveal and/or concealed testing and research data; and selectively and misleadingly revealed and/or analyzed testing and research data.

108.   Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of Simplex HV Bone Cement. Further, in no way could Plaintiff have known that Simplex HV Defendants had designed, developed, and manufactured the Simplex HV Bone Cement in such a way as to increase the risk of harm or injury to the recipients of it.

109.   As a direct and proximate result of the conduct of Simplex HV Defendants as aforesaid, Plaintiff suffered serious and permanent non-economic and economic injuries.

110.   Defendants acted maliciously and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

111.   WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, and all such other relief as the Court deems proper.

### COUNT III
### (Products Liability – Defective Design)

112.   Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

113.    DePuy Defendants are the researcher, developer, manufacturer, distributor, marketer, promoter, supplier and seller of the DePuy Attune Knee, which is defective and unreasonably dangerous to consumers.

114.    The DePuy Attune Knee is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation. The DePuy Attune Knee is defective in design or formulation in that it lacks efficacy and/or it poses a greater likelihood of injury than other knee replacement devices and similar knee replacement devices on the market and is more dangerous than ordinary consumers can reasonably foresee.

115.    If the design defect were known at the time of manufacture, a reasonable person would have concluded that the utility of the DePuy Attune Knee did not outweigh the risk of marketing a product designed in that manner.

116.    The defective condition of the DePuy Attune Knee rendered it unreasonably dangerous and/or not reasonably safe, and the DePuy Attune Knee was in this defective condition at the time it left the hands of the DePuy Defendants. The DePuy Attune Knee was expected to and did reach consumers, including Plaintiff Frank Nelson, without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

117.    Plaintiff and his physician were unaware of the significant hazards and defects in the DePuy Attune Knee. Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of the DePuy Attune Knee. Further, in no way could Plaintiff have known that DePuy Defendants had designed, developed, and

manufactured the DePuy Attune Knee in such a way as to increase the risk of harm or injury to the recipients of it.

118.    The DePuy Attune Knee was unreasonably dangerous and/or not reasonably safe in that it was more dangerous than would be reasonably contemplated by the ordinary user. During the period that Plaintiff used the DePuy Attune Knee, it was being utilized in a manner that was intended by DePuy Defendants.

119.    At the time Plaintiff received and used the DePuy Attune Knee, it was represented to be safe and free from latent defects.

120.    DePuy Defendants are strictly liable to Plaintiff for designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of DePuy Defendants because of the design defects.

121.    DePuy Defendants knew or should have known of the danger associated with the use of the DePuy Attune Knee, as well as the defective nature of the DePuy Attune Knee but has continued to design, manufacture, sell, distribute, market, promote and/or supply the DePuy Attune Knee so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by the DePuy Attune Knee.

122.    As a direct and proximate cause of the design defect and DePuy Defendants' misconduct as set forth herein, Plaintiff has suffered and continues to suffer serious and permanent non-economic and economic injuries.

123.    Simplex HV Defendants are the researcher, developer, manufacturer, distributor, marketer, promoter, supplier, and seller of the Simplex HV Bone Cement, which is defective and unreasonably dangerous to consumers.

124.     The Simplex HV Bone Cement is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation. The Simplex HV Bone Cement is defective in design or formulation in that it lacks efficacy and/or it poses a greater likelihood of injury than other bone cements and similar bone cements on the market and is more dangerous than ordinary consumers can reasonably foresee.

125.     If the design defect were known at the time of manufacture, a reasonable person would have concluded that the utility of the Simplex HV Bone Cement did not outweigh the risk of marketing a product designed in that manner.

126.     The defective condition of the Simplex HV Bone Cement rendered it unreasonably dangerous and/or not reasonably safe, and the Simplex HV Bone Cement was in this defective condition at the time it left the hands of the Simplex HV Defendants. Simplex HV Bone Cement was expected to and did reach consumers, including Plaintiff Frank Nelson, without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

127.     Plaintiff and his physician were unaware of the significant hazards and defects in the Simplex HV Bone Cement. Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of Simplex HV Bone Cement. Further, in no way could Plaintiff have known that Simplex HV Defendants had designed, developed, and manufactured the Simplex HV Bone Cement in such a way as to increase the risk of harm or injury to the recipients of it.

24

128. Simplex HV Bone Cement was unreasonably dangerous and/or not reasonably safe in that it was more dangerous than would be reasonably contemplated by the ordinary user. During the period that Plaintiff used the Simplex HV Bone Cement, it was being utilized in a manner that was intended by Simplex HV Defendants.

129. At the time Plaintiff received and used the Simplex HV Bone Cement, it was represented to be safe and free from latent defects.

130. Simplex HV Defendants are strictly liable to Plaintiff for designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of Simplex HV Defendants because of the design defects.

131. Simplex HV Defendants knew or should have known of the danger associated with the use of the Simplex HV Bone Cement, as well as the defective nature of the Simplex HV Bone Cement but has continued to design, manufacture, sell, distribute, market, promote and/or supply the Simplex HV Bone Cement so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by the Simplex HV Bone Cement.

132. As a direct and proximate cause of the design defect and Simplex HV Defendants' misconduct as set forth herein, Plaintiff has suffered and continues to suffer serious and permanent non-economic and economic injuries.

133. Defendants acted maliciously and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

134.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, and all such other relief as the Court deems proper.

## COUNT IV
### (Negligence)

135.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

136.    At all relevant times, DePuy Defendants had a duty to exercise reasonable care in the design, formulation, testing, manufacture, marketing, sale, and distribution of the DePuy Attune Knee, including a duty to ensure that the DePuy Attune Knee did not pose a significantly increased risk of bodily injury to its users.

137.    DePuy Defendants had a duty to exercise reasonable care in the advertising and sale of the DePuy Attune Knee, including a duty to warn Plaintiff and other consumers of the dangers associated with the consumption of the DePuy Attune Knee that were known or should have been known to DePuy Defendants at the time of the sale of the DePuy Attune Knee to the Plaintiff.

138.    DePuy Defendants failed to exercise reasonable care in the design, testing, manufacture, marketing, sale and distribution of the DePuy Attune Knee because DePuy Defendants knew or should have known that the DePuy Attune Knee had a propensity to cause serious injury, including loosening and revision surgery.

139.    DePuy Defendants failed to exercise ordinary care in the labeling of the DePuy Attune Knee and failed to issue adequate pre-marketing or post-marketing warnings to prescribing doctors and the general public regarding the risk of serious injury, including loosening and revision surgery.

140.    DePuy Defendants knew or should have known that Plaintiff could foreseeably suffer injury as a result of DePuy Defendants' failure to exercise ordinary care as described above.

141.    DePuy Defendants breached their duty of reasonable care to Plaintiff by failing to exercise due care under the circumstances.

142.    Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of the DePuy Attune Knee. Further, in no way could Plaintiff have known that DePuy Defendants had designed, developed, and manufactured the DePuy Attune Knee in such a way as to increase the risk of harm or injury to the recipients of it.

143.    As a direct and proximate result of DePuy Defendants' acts and omissions, including their failure to exercise ordinary care in the design, formulation, testing, manufacture, sale, and distribution of the DePuy Attune Knee, Plaintiff was implanted with the DePuy Attune Knee and suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, permanent instability, and loss of balance, immobility, and pain and suffering, for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

144.    At all relevant times, Simplex HV Defendants had a duty to exercise reasonable care in the design, formulation, testing, manufacture, marketing, sale, and distribution of the Simplex HV Bone Cement, including a duty to ensure that Simplex HV Bone Cement did not pose a significantly increased risk of bodily injury to its users.

145.    Simplex HV Defendants had a duty to exercise reasonable care in the advertising and sale of Simplex HV Bone Cement, including a duty to warn Plaintiff and other consumers, of

the dangers associated with the consumption of Simplex HV Bone Cement that were known or should have been known to Simplex HV Defendants at the time of the sale of Simplex HV Bone Cement to the Plaintiff.

146.   Simplex HV Defendants failed to exercise reasonable care in the design, testing, manufacture, marketing, sale, and distribution of Simplex HV Bone Cement because Simplex HV Defendants knew or should have known that Simplex HV Bone Cement had a propensity to cause serious injury, including loosening in knee implants and revision surgery.

147.   Simplex HV Defendants failed to exercise ordinary care in the labeling of Simplex HV Bone Cement and failed to issue adequate pre-marketing or post-marketing warnings to prescribing doctors and the general public regarding the risk of serious injury, including loosening in knee implants and revision surgery.

148.   Simplex HV Defendants knew or should have known that Plaintiff could foreseeably suffer injury as a result of Simplex HV Defendants' failure to exercise ordinary care as described above.

149.   Simplex HV Defendants breached their duty of reasonable care to Plaintiff by failing to exercise due care under the circumstances.

150.   Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of Simplex HV Bone Cement. Further, in no way could Plaintiff have known that Simplex HV Defendants had designed, developed, and manufactured the Simplex HV Bone Cement in such a way as to increase the risk of harm or injury to the recipients of it.

151.   As a direct and proximate result of Simplex HV Defendants' acts and omissions, including its failure to exercise ordinary care in the design, formulation, testing, manufacture,

sale, and distribution of Simplex HV Bone Cement, Simplex HV Bone Cement was used to bond Plaintiff Frank Nelson's knee implant, and he suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to cost of medical care, rehabilitation, lost income, permanent instability, and loss of balance, immobility, and pain and suffering for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

152.    Defendants acted maliciously and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

153.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, and all such other relief as the Court deems proper.

## COUNT V
## (Breach of Express Warranty)

154.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

155.    DePuy Defendants advertised, labeled, marketed and promoted its product, the DePuy Attune Knee, representing the quality to health care professionals, the FDA, Plaintiff Frank Nelson, and the public in such a way as to induce its purchase or use, thereby making an express warranty that the DePuy Attune Knee would conform to the representations. More specifically, DePuy Defendants represented that the DePuy Attune Knee was safe and effective, that it was safe and effective for use by individuals such as Plaintiff, and/or that it was safe and effective to treat Plaintiff's condition.

156.    The representations, as set forth above, contained or constituted descriptions of the goods and/or affirmations of fact or promises made by the seller to the buyer which related to

the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

157.    The DePuy Attune Knee did not conform to the representations made by DePuy Defendants in that the DePuy Attune Knee was not safe and effective, was not safe and effective for use by individuals such as Plaintiff, and/or was not safe and effective to treat in individuals, such as Plaintiff.

158.    At all relevant times, Plaintiff Frank Nelson used the DePuy Attune Knee for the purpose and in the manner intended by DePuy Defendants.

159.    Plaintiff and Plaintiff's physician, by the use of reasonable care, would not have discovered the breached warranty and realized its danger.

160.    The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries.

161.    As a direct and proximate result of DePuy Defendants' breach of warranty, Plaintiff Frank Nelson was implanted with the DePuy Attune Knee and suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, permanent instability and loss of balance, immobility, and pain and suffering, for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

162.    Simplex HV Defendants advertised, labeled, marketed, and promoted its product, Simplex HV Bone Cement, representing the quality to health care professionals, the FDA, Plaintiff Frank Nelson, and the public in such a way as to induce its purchase or use, thereby making an express warranty that Simplex HV Bone Cement would conform to the representations. More specifically, Simplex HV Defendants represented that Simplex HV Bone

Cement was safe and effective, that it was safe and effective for use by individuals such as Plaintiff, and/or that it was safe and effective to treat Plaintiff's condition.

163.    The representations, as set forth above, contained or constituted descriptions of the goods and/or affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

164.    Simplex HV Bone Cement did not conform to the representations made by Simplex HV Defendants in that Simplex HV Bone Cement was not safe and effective, was not safe and effective for use by individuals such as Plaintiff, and/or was not safe and effective to treat in individuals, such as Plaintiff.

165.    At all relevant times, Plaintiff Frank Nelson used Simplex HV Bone Cement for the purpose and in the manner intended by Simplex HV Defendants.

166.    Plaintiff and Plaintiff's physician, by the use of reasonable care, would not have discovered the breached warranty and realized its danger.

167.    The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries.

168.    As a direct and proximate result of Simplex HV Defendants' breach of warranty, Simplex HV Bone Cement was used to bond Plaintiff Frank Nelson's knee implant, and he suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to cost of medical care, rehabilitation, lost income, permanent instability and loss of balance, immobility, and pain and suffering for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

169.    Defendants acted maliciously and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

170.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, and all such other relief as the Court deems proper.

## COUNT VI
### (Breach of Implied Warranty)

171.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

172.    The DePuy Attune Knee was not reasonably fit for the ordinary purposes for which such goods are used.

173.    At all relevant times, DePuy Defendants had reason to know the particular purpose for which the good is required and that Plaintiff, Plaintiff's physician, and/or Norton Women's and Children's Hospital relied on DePuy Defendants' expertise, skill, judgment, and knowledge to select or furnish suitable goods. Plaintiff and his healthcare providers reasonably relied upon the expertise, skill, judgment, and knowledge of DePuy Defendants, and upon the implied warranty that the product was safe, of merchantable quality, and fit for use by Plaintiff and other consumers.

174.    The products used by Plaintiff were not safe, of merchantable quality, nor fit for their intended use in that the dangerous propensities of the products when used as intended causes severe injury to the user. Plaintiff and Plaintiff's physician, by the use of reasonable care would not have discovered the breached warranty and realized its danger.

175.    The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries.

176.    As a direct and proximate result of DePuy Defendants' breach of warranty, Plaintiff was implanted with the DePuy Attune Knee and suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to cost of medical care, rehabilitation, lost income, permanent instability, and loss of balance, immobility, and pain and suffering, for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

177.    Simplex HV Bone Cement was not reasonably fit for the ordinary purposes for which such goods are used.

178.    At all relevant times, Simplex HV Defendants had reason to know the particular purpose for which the good is required and that Plaintiff, Plaintiff's physician, and/or Norton Women's and Children's Hospital relied on Simplex HV Defendants' expertise, skill, judgment, and knowledge to select or furnish suitable goods.  Plaintiff and his healthcare providers reasonably relied upon the expertise, skill, judgment, and knowledge of Simplex HV Defendants, and upon the implied warranty that the product was safe, of merchantable quality, and fit for use by Plaintiff and other consumers.

179.    The products used by Plaintiff were not safe, of merchantable quality, nor fit for their intended use in that the dangerous propensities of the products when used as intended causes severe injury to the user.  Plaintiff and Plaintiff's physician, by the use of reasonable care would not have discovered the breached warranty and realized its danger.

180.    The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries.

181.    As a direct and proximate result of Simplex HV Defendants' breach of warranty, Simplex HV Bone Cement was used to bond Plaintiff Frank Nelson's knee implant, and he

33

suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, permanent instability, and loss of balance, immobility, and pain and suffering, for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

182.    Defendants acted maliciously and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

183.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, and all such other relief as the Court deems proper.

## COUNT VII
## (Gross Negligence)

184.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

185.    DePuy Defendants' wrongful acts and/or omissions were a wanton or reckless disregard for the lives and safety of others, so Plaintiff is entitled to punitive damages.

186.    The DePuy Defendants misled both the medical community and the public at large, including Plaintiff herein, by making false representations about the safety and efficacy of the DePuy Attune Knee and by failing to provide adequate instructions and training concerning its use. DePuy Defendants downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of the DePuy Attune Knee despite available information demonstrating that the DePuy Attune Knee could loosen and separate, causing serious harm to patients.

187.    Such risks and adverse effects could easily have been avoided had DePuy Defendants not concealed knowledge of the serious and permanent side effects and risks

associated with the use of the DePuy Attune Knee or provided proper training and instruction to physicians regarding use of the DePuy Attune Knee.

188.    DePuy Defendants' misrepresentations included knowingly withholding material information from the FDA, the medical community and the public, including Plaintiff, concerning the safety of the DePuy Attune Knee.

189.    DePuy Defendants were or should have been in possession of evidence demonstrating that the DePuy Attune Knee caused serious side effects. Nevertheless, DePuy Defendants continued to market the DePuy Attune Knee by providing false and misleading information with regard to its safety and efficacy.

190.    DePuy Defendants failed to provide warnings that would have dissuaded health care professionals from using the DePuy Attune Knee, thus preventing health care professionals and consumers, including Plaintiff, from weighing the true risks against the benefits of using the DePuy Attune Knee.

191.    DePuy Defendants failed to provide adequate training and instructions to physicians that could have prevented failure of the DePuy Attune Knee causing serious harm and suffering to patients, including Plaintiff Frank Nelson.

192.    Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of the DePuy Attune Knee and DePuy Defendants' wrongful acts and/or omissions that were a wanton or reckless disregard for the lives and safety of others. Further, in no way could Plaintiff have known that DePuy Defendants had designed, developed, and manufactured the DePuy Attune Knee in such a way as to increase the risk of harm or injury to the recipients of it.

193. As a direct and proximate result of DePuy Defendants' wrongful acts and/or omissions that were a wanton or reckless disregard for the lives and safety of others, Plaintiff was implanted with the DePuy Attune Knee and suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, permanent instability, and loss of balance, immobility, and pain and suffering, for which he is entitled to compensatory damages, special damages, and punitive damages in an amount to be proven at trial.

194. Simplex HV Defendants' wrongful acts and/or omissions were a wanton or reckless disregard for the lives and safety of others, so Plaintiff is entitled to punitive damages.

195. Simplex HV Defendants misled both the medical community and the public at large, including Plaintiff herein, by making false representations about the safety and efficacy of Simplex HV Bone Cement and by failing to provide adequate instructions and training concerning its use. Simplex HV Defendants downplayed, understated, and/or disregarded its knowledge of the serious and permanent side effects and risks associated with the use of Simplex HV Bone Cement despite available information demonstrating that Simplex HV Bone Cement could debond and cause loosening in knee implants, causing serious harm to patients.

196. Such risks and adverse effects could easily have been avoided had Simplex HV Defendants not concealed knowledge of the serious and permanent side effects and risks associated with the use of Simplex HV Bone Cement or provided proper training and instruction to physicians regarding use of Simplex HV Bone Cement.

197. Simplex HV Defendants' misrepresentations included knowingly withholding material information from the FDA, the medical community, and the public, including Plaintiff concerning the safety of Simplex HV Bone Cement.

198.    Simplex HV Defendants was or should have been in possession of evidence demonstrating that Simplex HV Bone Cement caused serious side effects. Nevertheless, Simplex HV Defendants continued to market Simplex HV Bone Cement by providing false and misleading information with regard to its safety and efficacy.

199.    Simplex HV Defendants failed to provide warnings that would have dissuaded health care professionals from using Simplex HV Bone Cement, thus preventing health care professionals and consumers, including Plaintiff, from weighing the true risks against the benefits of using Simplex HV Bone Cement.

200.    Simplex HV Defendants failed to provide adequate training and instructions to physicians that could have prevented failure of Simplex HV Bone Cement causing serious harm and suffering to patients, including Plaintiff Frank Nelson.

201.    Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of Simplex HV Bone Cement and Simplex HV Defendants' wrongful acts and/or omissions that were a wanton or reckless disregard for the lives and safety of others. Further, in no way could Plaintiff have known that Simplex HV Defendants had designed, developed, and manufactured the Simplex HV Bone Cement in such a way as to increase the risk of harm or injury to the recipients of it.

202.    As a direct and proximate result of Simplex HV Defendants' wrongful acts and/or omissions that were a wanton or reckless disregard for the lives and safety of others, Simplex HV Bone Cement was used to bond Plaintiff Frank Nelson's knee implant, and he suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to cost of medical care, rehabilitation, lost income, permanent instability, and loss of balance,

immobility, and pain and suffering for which he is entitled to compensatory damages, special damages, and punitive damages in an amount to be proven at trial.

203. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages and punitive damages, together with interest, costs of suit, and such other relief as the Court deems proper.

## COUNT VIII
### (Violation of Kentucky Consumer Protection Act)

204. Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

205. DePuy Defendants are liable to Plaintiff pursuant to the Kentucky Consumer Protection Act, KRS 367.170, *et seq.* (hereinafter, "KCPA"). DePuy Defendants advertised, labeled, marketed, and promoted their product, the DePuy Attune Knee, representing its quality, safety, and effectiveness for use by individuals such as Plaintiff and/or that for treating Plaintiff's condition when DePuy Defendants knew or should have known about the DePuy Attune Knee's dangerous propensity to loosen and cause patients unnecessary pain and revision surgeries, constituting unfair, misleading, or deceptive acts or practices in the conduct of trade or commerce.

206. Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of the DePuy Attune Knee. Further, in no way could Plaintiff have known that DePuy Defendants had designed, developed, and manufactured the DePuy Attune Knee in such a way as to increase the risk of harm or injury to the recipients of it.

207. Plaintiff purchased the DePuy Attune Knee from DePuy Defendants for personal purposes and subsequently suffered loss of money or property as a result of the DePuy

Defendants' use of unfair, misleading, or deceptive acts or practices in the conduct of trade or commerce.

208.    Simplex HV Defendants are liable to Plaintiff pursuant to the KCPA.  Simplex HV Defendants advertised, labeled, marketed, and promoted their product, Simplex HV Bone Cement, representing the its quality, safety, and effectiveness for use by individuals such as Plaintiff and/or that for treating Plaintiff's condition when Simplex HV Defendants knew or should have  known about Simplex HV Bone Cement's dangerous propensity to loosen in knee implants and cause patients unnecessary pain and revision surgeries, constituting unfair, misleading, or deceptive acts or practices in the conduct of trade or commerce.

209.    Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of Simplex HV Bone Cement. Further, in no way could Plaintiff have known that Simplex HV Defendants had designed, developed, and manufactured the Simplex HV Bone Cement in such a way as to increase the risk of harm or injury to the recipients of it.

210.    Plaintiff purchased the Simplex HV Bone Cement from Simplex HV Defendants for personal purposes and subsequently suffered loss of money or property as a result of the Simplex HV Defendants' use of unfair, misleading, or deceptive acts or practices in the conduct of trade or commerce.

211.    At all times mentioned, Defendants' conduct was in violation of the KCPA in that Defendants' conduct constitutes business practices, which are unfair, false, misleading, and deceptive.

212.    Privity of contract existed between Plaintiff and Defendants.

213.    Plaintiff while using Defendants' products in the usual and customary manner as intended, suffered injury as a proximate result of Defendant placing the products on the market, Defendants' use of false and/or misleading misrepresentations and/or omissions of material facts in connection with the marketing, promotion and sale of the products. Defendants communicated the purported benefits of the products while failing to disclose serious and dangerous injuries related to the use of the products, with the intent that consumers such as Plaintiff, would rely upon the misrepresentations and purchase and use the products believing them to be safe and beneficial for use in the prescribed, usual and customary manner.

214.    Defendants' violations of the KCPA are a substantial factor in causing the Plaintiff to endure mental pain and anguish, humiliation, mortification, and has further caused the Plaintiff to incur substantial pecuniary loss. Plaintiff has further been caused to incur attorneys' fees as a result of Defendants' conduct.

215.    Defendants acted towards the Plaintiff with reckless disregard of the Plaintiff's rights, thereby entitling the Plaintiff to punitive damages.

216.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorney fees, and such other relief as the Court deems proper.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, DePuy Synthes Sales, Inc., d/b/a DePuy Synthes Joint Reconstruction, DePuy Synthes, Inc., DePuy Orthopaedics, Inc., Johnson & Johnson, Stryker Corporation, Howmedica Osteonics Corporation, d/b/a Stryker Orthopaedics, and aap Implants, Inc., as follows:

a.       Compensatory damages, in excess of the amount required for federal diversity jurisdiction and in an amount to fully compensate Plaintiff for all his injuries and damages, both past and present;

b.       Punitive damages;

c.       Expenses and costs of this action;

d.       Attorneys' fees;

e.       Pre-judgment and post-judgment interest in the maximum amount allowed by law; and

f.       Such further relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

DATED: October 12, 2018

Respectfully submitted,

*/s/ Jennifer A. Moore*
Jennifer A. Moore
Ashton Rose Smith
GROSSMAN AND MOORE, PLLC
One Riverfront Plaza
401 W. Main St., Ste 1810
Louisville, KY  40202
T:  502-657-7100
F:  502-657-7111
jmoore@gminjurylaw.com
asmith@gminjurylaw.com

and

Russell S. Briggs
Texas State Bar No: 02987720
FIBICH, LEEBRON, COPELAND & BRIGGS
1150 Bissonnet Street
Houston, TX  77005-1848
(713) 751-0025
(713) 751-0030 fax
rbriggs@fibichlaw.com
(Motion for *Pro Hac Vice* Admission
to be filed)

*Counsel for Plaintiff*